Merrimack, }
Oct. 6, 1908. }

STEARNS, *Adm'r*, v. BOSTON & MAINE RAILROAD.

The fact that a traveler attempts to cross a railroad track in advance of a train which he knows to be approaching does not conclusively prove his negligence, regardless of other evidence.

The question whether a traveler exercised due care in attempting to cross a railroad track in advance of an approaching train is properly submitted to the jury, when the evidence discloses that he would have crossed in safety but for the fact that the train was running at twice the speed permitted by the rules of the road, and warrants the inference that he drove upon the track in the reasonable belief that the train was moving at the customary speed, with which he was familiar.

The question whether trainmen negligently failed to prevent a collision at a crossing after discovering a traveler in a position of danger cannot be submitted to the jury, in the absence of evidence that, after the peril became apparent, the speed of the train could have been checked sufficiently to permit the injured person to cross in safety.

The failure of an engineer to sound the whistle, upon observing a traveler approaching a crossing, does not constitute actionable negligence, in the absence of evidence that such warning would have prevented a collision.

CASE, for negligently causing death. Trial by jury and verdict for the plaintiff. Transferred from the October term, 1906, of the superior court by *Wallace*, C. J.

The plaintiff's evidence tended to prove the following facts: The defendants' tracks at South Danbury run nearly north and south. A station and milk platform, situated on the west side of the tracks, are reached by a private way which the railroad has provided over its land for the use of patrons, and which furnishes

a means of access to the station from the main street of the village, which is located about ten rods east of the railroad. The milk train, so called, is due at the station from the north at 8:31 a. m. About twenty minutes past eight on the morning of November 1, 1905, Charles C. Stearns, the plaintiff's intestate, who had delivered milk at the station for four years, drove a pair of horses attached to a wagon loaded with milk into the private way leading to the station, with the intention of taking his load to the milk train. When he reached a point fifty-seven feet east of the westerly track, he could see in a northerly direction up the tracks. A heavily loaded freight train, about two hours late and not scheduled to stop at South Danbury, was approaching from the north. The plaintiff continued on his way, attempted to pass over the tracks before the approaching train, and was killed by the collision which resulted. The place of collision was not a highway crossing and was not provided with bars, gates, or flagmen. As Stearns drove toward the tracks and the train approached the station, a man who stood upon the platform waved his hand up and down over the track occupied by the train, for the purpose of preventing Stearns from crossing, and also shouted to him with a like motive. Other facts are stated in the opinion.

The defendants excepted to the denial of their motions for a nonsuit and the direction of a verdict in their favor, and also to the submission to the jury of the question whether the defendants could have prevented the collision by ordinary care, after they knew or ought to have known of the danger.

*Martin & Howe*, for the plaintiff.

*Mitchell, Foster & Lake* (with whom was *Fred C. Demond* on the brief), for the defendants.

PARSONS, C. J. Stearns, the plaintiff's intestate, was killed by a collision between the team which he was driving and the defendants' train, upon a crossing provided by them for his use. He drove upon the crossing knowing that a train was approaching. Does this fact, with the subsequent collision, conclusively establish that his attempt to cross was negligent? The contrary was held in *Davis* v. *Railroad*, 68 N. H. 247, and *Folsom* v. *Railroad*, 68 N. H. 454.

The conduct of the parties resulting in injury to one of them is to be judged, not by the fact that injury has resulted from the course pursued, but in the light of the circumstances known or discoverable by ordinary care when the course followed was decided

upon. In the former of the cases cited the colliding train was running "at a rate of speed three times as great as that allowed by.the defendants' rules." It was said: "It must be presumed that the rules were made to be enforced, and that they were generally obeyed. Although the deceased may not have known of the existence of the rule, yet he was familiar with the crossing, frequently traveled over it, and might reasonably act on the belief that the train would be run at the usual speed in passing the station. There was at least fair room for argument that, if the rule had been obeyed, he would have had sufficient time for crossing without injury or unreasonable risk, and that it would not have been an imprudent act." *Davis* v. *Railroad*, 68 N. H. 247, 251; *Nutter* v. *Railroad*, 60 N. H. 483, 485. In *Folsom* v. *Railroad*, 68 N. H. 454, the person injured having been placed in a position of danger without fault on his part, his error of judgment in attempting to escape by crossing the track in advance of the train was held not necessarily negligence. These positions have not been overruled in the later cases upon which the defendants rely. *Gahagan* v. *Railroad*, 70 N. H. 441; *Waldron* v. *Railroad*, 71 N. H. 362; *Wright* v. *Railroad*, 74 N. H. 128. The first two cases hold that one approaching a railroad crossing is bound to exercise care commensurate with the danger of the situation, and that where the evidence discloses without question or conflict that no care whatever was exercised there is no question for submission to the jury; while the latter, overruling *Huntress* v. *Railroad*, 66 N. H. 185, holds that in the absence of all evidence the burden of proof resting upon the plaintiff to show care cannot be supplied by any presumption resting upon the general desire of life or fear of injury.

That certain acts, such as the failure to look or listen upon approaching a railroad crossing, conclusively establish negligence as a part of the cause of an injury has been repeatedly argued without success in negligence cases. In *Gahagan* v. *Railroad* it was said: "An exact definition of care and negligence, establishing what acts are careful and what acts or omissions are careless at all times, in all places, and under all circumstances, would be a great convenience in judicial administration; but unless the rule that due care is the care of the ordinarily prudent person under all the circumstances is abrogated, it can never be said logically that the mere presence or absence of certain evidentiary facts will always determine the question without reference to other facts appearing in particular cases." *Gahagan* v. *Railroad*, 70 N. H. 441, 445; *Smith* v. *Railroad*, 70 N. H. 53, 85; *Roberts* v. *Railroad*, 69 N. H. 354; *Davis* v. *Railroad*, 68 N. H. 247, 249, 250. Without a departure from the fundamental principles of the law

of negligence as understood in this jurisdiction, it cannot be held
that the fact that the party injured in a railroad crossing collision
went upon the track knowing a train was approaching conclusively
establishes his negligence, regardless of all other evidence in the
case. "Decisions are to be found wherein such a doctrine has
been upheld in other jurisdictions, but they proceed upon a theory
so at variance with the law of negligence in this jurisdiction as to
be of little value here. The rule in this state is that each case is
to be determined in the light of its own circumstances." *Bass* v.
*Railway*, 70 N. H. 170, 172.

The apparent conflict of the cases cited by the defendants results
mainly from the method of statement. In *State* v. *Railroad*, 76
Me. 357, a case particularly relied upon, it is said: "One in full
possession of his faculties, who undertakes to cross a railroad track
at the very moment a train of cars is passing, or when a train is so
near that he is not only liable to be but is in fact struck by it, is
*prima facie* guilty of negligence; and *in the absence of a satisfac-
tory excuse*, his negligence must be regarded as established." This
appears to be merely another way of stating the rule in this state:
that the plaintiff cannot recover without offering evidence from
which his conduct, whatever it was, can reasonably be found to
have been prudent. The real ground of the decisions in other
jurisdictions, which have been cited, appears to have been that
there was nothing in the evidence in the particular cases justifying
the conduct of the party injured. If this be the true meaning of
the cases, they are not in conflict in principle with the law of this
jurisdiction. If it is not, they cannot be followed here. Perhaps
it cannot be fairly said that the defendants' position is as broad as
above stated, or as might be inferred from the selections from
various authorities quoted in brief and argument. The position
stated in the brief is, that "it could not reasonably be found from
the evidence that the deceased exercised due care for his own safe-
ty." This requires a consideration of the evidence.

It is conceded, as already stated, that Stearns attempted to cross
the track knowing that a train was approaching. There was evi-
dence that, at his rate of travel after discovering the train, he
would have crossed in safety in advance of the train if its speed
had not exceeded twenty-five miles per hour, but he was struck by
the train because its speed exceeded fifty miles an hour. The
causes of the injury were, therefore, in this view of the evidence,
the speed of the train, conceded under the circumstances of the
case to warrant the conclusion the defendants were negligent, and
Stearns' decision to cross, made upon seeing the train. As there
was no evidence which conclusively established that Stearns in-
tended to commit suicide, it could be found he made the attempt.

because of a mistake as to the speed of the train. There was evidence from which it is claimed that Stearns may have reasonably understood that the approaching train was the milk train, which stopped at the South Danbury station, and the speed of which while slowing down for the stop would be much less than twenty-five miles per hour. The train was, however, a freight, over an hour behind time, running about ten minutes in advance of the regular time of the milk train.

Whether Stearns understood the train to be the milk train or recognized it as a freight, it is claimed, is mere speculation; but assuming he knew, or must be held to have known, the train was a freight, it does not follow he must be charged with knowledge of its excessive speed. The regular speed of this freight at this point, according to the time-card, was a fraction over twenty-two miles an hour, and the rules of the road prohibited the running of freight trains over twenty-five miles an hour. Another rule required a long blast of the whistle upon approaching stations at which no stop was to be made. There was evidence that this whistle was omitted or not properly given. There was no direct evidence that Stearns was acquainted with the rules of the road, or had seen this particular freight pass at about this hour; but it appeared that he had been driving to this train with milk for four years, and that occasionally a freight would pass ahead of the milk train. It is to be presumed the defendants' road is operated in accordance with the rules, and it could be inferred that Stearns, by observation during his four years' attendance, had become acquainted with the customary manner of moving trains. In the absence of evidence that the defendants' employees were accustomed to run freight trains, or this train at this place, in violation of the rules of the road, it might reasonably be found that Stearns knew the time it took the train, as it should be and was customarily run, to reach the crossing, even if he was not led to believe by the absence of the station whistle that it would slow down for a stop, and, being aware of the speed of his team, judged there was time for him to cross,—a conclusion which would have been correct except for the unusual speed of the train. There was also evidence that one of his horses was somewhat afraid of the cars. This fact, though not controlling, is evidence to be considered with the other facts in the case upon the question whether a man of ordinary prudence, placed in the situation Stearns was, with the knowledge he had or ought to have had, would have done as he did. As there was evidence tending to establish a belief in his mind that the train speed did not exceed twenty-five miles an hour, that question, if material, could not be taken from the jury. Nor can it be said that there was no evidence tending to show that the

ordinary man would not have acted as Stearns did, in the face of the evidence that, upon the facts as it might be found he understood them, the course he pursued was safe.

It is not the fact that prudent persons do not cross a railroad track when they know a train is approaching. To do so may be safe or dangerous. " No inflexible rule can be laid down as to the distance before a moving train within which it is safe to attempt a crossing. It will depend upon the rate of speed at which the train is moving and the condition of the person. Each case therefore must measurably depend upon its own peculiar facts." *State* v. *Railroad,* 69 Md. 339. It is urged that, although Stearns looked at and saw the train when he was fifty-seven feet from the crossing, he did not again look toward the train until just as the engine was upon him. Whether a person of ordinary prudence, having reached the conclusion that his prudent course was to drive over the track, would then have given his whole attention to carrying out the course he had decided upon, or would have diverted his attention from his team, is a question of fact. "We have to deal with man as we find him. When we get information that fixes upon our minds an impression that a certain state of facts exists, we act upon that impression. We satisfy ourselves that we are right, and then go ahead. At least, ordinarily prudent men do this. Dr. Gratiot [the plaintiff] saw an engine half a mile away that he supposed was on a switch, and of course not approaching him at all. He accepted this as a fact and acted on it; and there would be no more reason in requiring him to look constantly up the track to learn whether he was mistaken about this supposed fact, than to require men in their multitudinous affairs to hesitate at every step and question not only the correctness of their judgment, but even the truth or falsity of what seem to be the facts that environ them. It would be a great boon to humanity if no mistakes could occur; but to require men to hesitate to act upon what seems manifest to their eyes and ears, simply because it is possible that they may not have seen and heard the fact as it is, would virtually stop business and commerce." *Gratiot* v. *Railroad,* (Mo.) 16 L. R. A. 189; *Bonnell* v. *Railroad,* 39 N. J. Law 189.

It has been held in several cases that the reliance of the engineer upon the assumption that a person whom he sees approaching a crossing at a distance will stop and allow the train to go by is not even evidence of negligence; and it can hardly be held that the highway traveler's assumption that the railroad employees are not approaching the crossing with a reckless disregard of its dangers, is conclusive evidence of negligence in the traveler. There was no error in the denial of the motions for a nonsuit and verdict.

But although reasonable men might on the evidence have found Stearns' conduct careful, they might also have found it careless. The plaintiff claimed that if Stearns was negligent in attempting to cross the track, and thereby got himself into a position of danger from which he could not extricate himself, yet the defendants' servants in charge of the train in the exercise of due care ought to have seen him in season to have slackened the speed of the train and averted the accident. The defendants excepted to the submission to the jury of the question whether the defendants could have prevented the collision after seeing Stearns in a place of danger. The defendants concede as matter of law that if the trainmen, after they discovered or ought to have discovered the danger, could with the facilities at their command have prevented the injury by due care, the defendants are liable. *Gahagan* v. *Railroad*, 70 N. H. 441; *Yeaton* v. *Railroad*, 73 N. H. 285. The ground of the exception is that no evidence was produced before the jury upon which it could be found that the speed of the train could have been so slackened as to prevent the injury after the peril became apparent.

Stearns saw the train when fifty-seven feet from the crossing, whipped up his team, and attempted to cross. It was at this point he came in sight of the train, and the trainmen, if observant, could and should have discovered his attempt to cross. At this time the train was about at the underpass, one witness placing the engine just north of it, so that the greatest distance of the train from the crossing upon any evidence in the case was 435 feet. The witness Chase testified that with the brakes in working order the train could have been stopped in 300 to 350 feet, if the speed did not exceed twenty-five miles an hour.

If the jury believed the testimony of the trainmen that the speed did not exceed twenty-five miles an hour and that of the plaintiff's expert, Chase, and found that the brakes were in working order, they could have found that after the trainmen knew or ought to have known of Stearns' attempt to cross they could have stopped the train before it reached the crossing. But this would not authorize a verdict for the plaintiff, because both parties concede, and the fact is amply apparent, that in such case no injury could have resulted from a failure to apply the brakes, because Stearns, if the train was at or above the underpass when he started up his team, must have passed the crossing and reached a place of safety before the train reached the crossing, if its speed did not exceed twenty-five miles an hour. Stearns was driving at a slow speed, estimated at four miles an hour, until he observed the train, when he started up his horses into a ten-mile gait. If his speed after he attempted to cross averaged only seven miles an

hour, or ten feet per second, in eight seconds he would have traveled eighty feet, passed over the crossing, and reached a place of safety. During the same length of time the train at twenty-five miles per hour, or thirty-six and one third feet per second, would have traveled 290 feet, or less than the least distance in which the witness Chase estimates it could have been stopped. But the train and Stearns' team met on the crossing. Therefore, either the train was much nearer the crossing or proceeding at much greater speed, or the defendants' experts were right and the plaintiff's wrong as to the distance within which the train could be stopped.

Whatever view of the facts is taken, it cannot reasonably be found that failure to stop the train after Stearns' peril became apparent was the negligent cause for the injury, upon evidence that the only situation in which the train could have been stopped must have been one from which no injury would have resulted. But the evidence of the experts on both sides as to the distance within which the train could be stopped was merely opinion, and was founded upon the proper working of the brakes. The defendants' evidence was that when the fireman, observing that Stearns was attempting to cross, called " Whoa," the engineer pulled the brake into the emergency position and applied the sand, and that that was all that could be done to check the train. There was no evidence that this was not done, or that anything else could have been done. The only ground for controversy was when it was done ; and the only ground for negligence in this respect, that this action was not taken as soon as it should have been. Whether the brakes were applied before the station was reached, as the trainmen testified, or at the time of or just after the collision, as evidence offered by the plaintiff had some tendency to establish, it was demonstrated, since the rear car passed the crossing before the train stopped, that, with the brakes in the condition in which they were and the speed of the train as it actually was, the length of the train (1,400 feet) was required to bring the train to a stop.

It is suggested that, on the evidence as to the distance within which the train was stopped, the expert evidence, and the failure to show an inspection of the brakes after the accident, it could be found the brakes were not in working order and that their failure to work was the reason the train did not stop in a less distance. This may be so. But the fact that the brakes were out of order tends to show, not that the train could have been more promptly stopped, but relieves the trainmen from the charge of negligence in not making a stop within less distance. As the trainmen could not have stopped the train by applying the brakes when the train

was at the underpass, if they ought to have recognized Stearns' peril at that point, it is immaterial that they did not do so until the train was nearer the crossing. The only answer suggested to this reasoning is that, though the train could not have been stopped before reaching the crossing, its speed could have been slackened and time allowed Stearns to cross. In *Yeaton* v. *Railroad*, 73 N. H. 285, and in *Duggan* v. *Railroad*, 74 N. H. 250, there was evidence that if the brakes had been applied there would have been no accident, even if the train were not stopped. In *Folsom* v. *Railroad*, 68 N. H. 454, the evidence was that less than six inches of the back of the deceased's sleigh was within the zone of danger when the train reached it. It was apparent that if the speed of the train had been a tenth of a second less there would have been no accident. In this case the engine struck the rear quarters of the horses. To have prevented the accident, the train must have been delayed so that the wagon in which Stearns was riding could have entered upon the track, crossed it, and passed beyond the overhang of the engine before the crossing was reached by it. Although the time necessary for Stearns to have reached a position of safety may be estimated from the evidence, and there was conflicting evidence as to the distance within which the train could be brought to a stop when running at twenty-five or fifty miles an hour, there was no evidence of the time within which either operation could be performed. Neither was there any evidence of the action of the brakes in checking the speed of the train.

The plaintiff appears to suggest in argument that the application of the brakes results in a decrease of speed directly proportionate to the distance traversed. The witness Clark testified that a train running twenty-five miles an hour could be stopped in 300 to 350 feet, if running forty to fifty miles in 1,300 to 1,400 feet, from which it can be argued that the rate at which the speed diminishes increases with the distance traversed; for it would seem to follow that, with the brakes set when the speed was diminished to twenty-five miles an hour, 350 feet more would bring the train to a standstill, and that it would therefore require at least 950 to 1,050 feet to reduce the speed from fifty to twenty-five miles. This may not be so. The action may be just the other way, more effective at first and having a less retarding effect for some reason or other the longer the distance traveled, or the retarding effect may be exactly proportional to the distance. However this may be, the action of a train under application of the brakes is not a matter of common knowledge. There was no evidence before the jury tending to show that the trainmen could have checked the speed of the train sufficiently to have permitted

Stearns to cross in safety. A conclusion that an earlier application of the brakes, at any time after Stearns had created the danger by his negligence, would have prevented the injury would have been mere conjecture founded on no evidence. The question was improperly submitted to the jury, because there was no evidence upon which it could be determined in the plaintiff's favor.

There was evidence that one Woodward, who saw Stearns when he turned into the passageway, stood on the station platform and waved his arms across the track, motioning to Stearns to stop; and it is claimed that the train was then opposite Langley's house 800 feet away, and that Woodward's motions, though not intended as a signal to the train to stop, should have been seen and so interpreted by the engineer, and that at that distance the train could have been stopped or the speed slackened sufficiently to have prevented the injury. It does not seem reasonable to convict the engineer of negligence because he did not understand a signal for Stearns as one for him. But however that may be, if the engineer was negligent at this time it was before Stearns imprudently attempted to cross and at a time when, if he had seen Stearns, he might have properly assumed Stearns would stop and permit the train to go by. Except for Stearns starting up his team, the engine would not have collided with the team. The only collision possible would have been between Stearns' horses and the side of the train. The trainmen's negligence before Stearns had created the danger by his negligence could not be held a failure to save him from the results of his own want of care. The failure to whistle at this time as a cause of the injury stands on the same ground, with the further objection that the purpose of the whistle is to give notice of the approach of the train, of which it is conceded Stearns was aware in season to protect himself. After he attempted to cross with knowledge of the approaching train, and was engaged in the attempt, there is no evidence further signaling by the whistle, if there was opportunity for it, would have stopped Stearns' team or prevented the injury.

There is no occasion to consider the remaining exceptions. The exceptions to the denial of the motions for a nonsuit and verdict are overruled. The exception to the submission of the second issue to the jury is sustained.

*Verdict set aside: new trial granted.*

All concurred.